UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARNELL M. CORSON,

                              Plaintiff,                    **REPORT**
          v.                                                **and**
                                                            **RECOMMENDATION**
MICHAEL J. ASTRUE,
Commissioner of Social Security,                            **07-CV-283A(F)**

                              Defendant.

_____

APPEARANCES:    OFFERMANN, CASSANO, GRECO, SLISZ & ADAMS , LLP
                Attorneys for Plaintiff
                JOSEPHINE A. GRECO, of Counsel
                1776 Statler Towers
                Buffalo, New York 14202-3090

                KATHLEEN M. MEHLTRETTER
                Acting United States Attorney
                Attorney for the Defendant
                KEVIN D. ROBINSON.
                Assistant United States Attorney, of Counsel
                138 Delaware Avenue
                Buffalo, New York 14202


## JURISDICTION

        This action was referred to the undersigned by Honorable Richard J. Arcara on July 18,

2007. The matter is presently before the court on Defendant's motion for judgment on the

pleadings (Doc. No. 7), filed on December 27, 2007, and on Plaintiff's cross motion for

summary judgment and in opposition to Defendant's motion for summary judgment (Doc. No.

10), filed on February 28, 2008.


## BACKGROUND

        Plaintiff Arnell M. Corson ("Corson") seeks review of Defendant's decision denying her

Social Security Disability Insurance ("SSDI") under Title II of the Social Security Act ("the Act"). The Commissioner found Corson suffers from an affective disorder and a back disorder. (R. 27). However, the Commissioner concluded there was sufficient evidence to support a finding of residual functional capacity of sedentary work. *Id.* As such, Corson was found not disabled. (R. 27, 34).

## PROCEDURAL HISTORY

Corson filed an application for disability benefits on March 29, 2002, claiming a disability onset date of January 17, 2000. (R. 53-58). Plaintiff's application was denied on July 29, 2002. (R. 31-34). At Corson's request, a hearing was held before Administrative Law Judge Bruce R. Mazzarella ("the ALJ") on August 18, 2004. (R. 749-87). At the hearing, Corson, represented by attorney Josephine A. Greco, appeared and testified. *Id.* On October 13, 2004, the ALJ issued a decision finding that the Corson was not disabled. (R. 16-26). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Corson's request for review on March 10, 2007. (R. 6-9). This action followed on April 27, 2007. (Doc. No. 1).

On December 27, 2007, the Defendant filed a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). (Doc. No. 7), ("Defendant's Motion"), supported by a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings. (Doc. No. 8)("Defendant's Memorandum"). On February 27, 2008, Corson filed a Cross Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment. (Doc. No. 10), ("Plaintiff's Motion").

Based on the following, Defendant's motion for judgment on the pleadings should be GRANTED; Corson's motion should be DENIED.

## FACTS

Corson was born on September 14, 1956. (R. 754). She has an eleventh grade education (R. 761). Corson lives with her husband in a home they own. (R. 754). At the time of the hearing, Corson was 5'3½" tall and weighed 210 pounds. (R. 754-55). Corson's past work experience includes work as a nurse's aide from 1981 to 1990, (R. 80, 757), and a surgical instrument work room aide from 1990 to 2000. (R. 79, 757-758).

Corson claims entitlement to SSDI benefits on the basis of a combination of exertional and nonexertional impairments. (Doc. No. 11) ("Plaintiff's Memorandum" at 33). Specifically, Corson claims her depression and degenerative disc disease have rendered her disabled within the meaning of the Social Security Act since January 17, 2000. *Id.*

Corson allegedly began treating with her physician, Sylvia H. Regalla, M.D., ("Dr. Regalla"), an internist, sometime prior to 1997.[1] (Plaintiff's Memorandum at 5). On May 31, 2000, Dr. Regalla examined Corson in connection with her worker's compensation claim. (R. 318). Dr. Regalla referred Corson to a pain management specialist. *Id.* Between May 2000, and March 2002, Dr. Regalla diagnosed L5-S1 herniation, L4-L5 and L5-S1 stenosis, L4-5 bulge, C5-6 and C6-7 disc bulge, left lower extremity radiculopathy and back pain with severe spasm.[2] (R. 276 -318). She opined that Corson remained "temporarily totally disabled." (R. 278 -318).

---

[1] The earliest treatment note in the record from Dr. Regalla is dated May 31, 2000. (R. 318). Thus, it is uncertain when Corson actually began treating with Dr. Regalla.

[2] Dr. Regalla also diagnosed chronic sinusitis, insomnia, improved peripheral edema, and sleep apnea during this time period.

Between March 2002 and September 2003, Dr. Regalla diagnosed Corson with chronic back pain, C5-6 and C6-7 disc bulge, L5-S1 disc herniation, and chest pain.[3] (R. 547- 566). Corson was prescribed various pain medications in these time periods.[4] (R. 276-318).

_____On May 22, 2000, Dr. Lazslo Mechtler reported to Dr. Regalla the findings of his neurologic consultation with Corson. (R. 202). Specifically, he concluded Ms. Corson had L5-S1 radiculopathy on the left, good strength throughout, without atrophy or fasciculation[5], intact cognitive functions, symmetric reflexes, and straight leg raising was positive on the left at 45°. *Id.* Dr. Mechtler noted minimal canal stenosis at L4-5, mild left neural foramen stenosis, and moderate to severe right neural foraminal stenosis at L5-S1. (R. 236). At the time of the exam, Corson reported taking Flonase, Allegra, Prilosec[6], Levsin[7], Meprobamate[8], and Celexa.[9] (R. 201).

On May 29, 2001, Wayne B. Fricke, M.D. ("Dr. Fricke"), evaluated Corson's condition as an independent medical examiner for the Worker's Compensation Board. (R. 233). Dr. Fricke

---

[3] Dr. Regalla also assessed lower extremity edema, shortness of breath from smoking, possible urinary tract infection, rash, and bowel movement difficulty during this time period.

[4] Specifically, Corson was prescribed Ultracet, OxyContin, and Hydrocodone at various times.

[5] Fasciculation is involuntary contraction or twitching of groups of muscle fibers. Information *available at* www.medterms.com/script/main/art.asp?articlekey=13290

[6] Prilosec is used to treat heartburn or irritation of the esophagus caused by gastroesophageal reflux disease. Information *available at* www.drugs.com/search.php?searchterm=prilosec&is_main_search=1

[7] Levsin is used for treating certain stomach, intestinal, and bladder conditions. Information *available at* www.drugs.com/search.php?searchterm=levsin&is_main_search=1

[8] Meprobamate is used for treating short-term anxiety. Information *available at* www.drugs.com/search.php?searchterm=meprobamate&is_main_search

[9] Celexa is used to treat depression. Information *available at* www.drugs.com/search.php?searchterm=celexa&is_main_search

referenced his April 14, 2000 examination of Corson, as a result of which he concluded Corson

suffered from degenerative disc disease. (R. 234).  At the time of the exam, Corson was taking a

Duragesic patch[10] every three days, Skelaxin[11], Naproxen[12], Prilosec, Allegra, Meprobamate,

Celexa and Flonase. (R. 237).  Dr. Fricke noted straight leg rising was positive on the left, no

weakness when walking on toes or heels, 0° extension, and bending to the right and left side to

the proximal thigh.  *Id.*  Ms. Corson complained of lower back pain with a pain level of 4/10 on a

good day and an 8/10 on a bad day.  *Id.*  Corson reported independence in activities of daily

living but inability to clean and grocery shop.  *Id.*  Dr. Fricke concluded Corson could return to

work on a restricted capacity with no lifting of more than 10 pounds. (R. 238).  Repetitive

bending and twisting was to be avoided.  *Id.*  Dr. Fricke recommended a minimum three month

period for these restrictions.  *Id.*

A diagnostic imaging report dated July 27, 2000 notes the vertebral discs of the lumbar

spine were normal in alignment, contour, and density. (R. 270).  Marked narrowing of the L5-S1

interspace with anterior osteophytes was unchanged from a prior exam.  *Id.*  Oblique imaging

indicated narrowing and sclerosis of the L5-S1 facet joints bilaterally.  *Id.*

Corson was treated nine times between July 21, 2000 and August 23, 2001 at Buffalo

Spine & Sports Medicine, P.C. by Ajay K. Masih, M.D., ("Dr. Masih"), (R. 240-50, 261, 57-64).

Through June 22, 2001, Corson was assessed with right shoulder impingement syndrome,

---

[10]Duragesic is a narcotic pain killer. It is used to treat moderate to severe chronic pain.  Information *available at* www.drugs.com/search.php?searchterm=duragesic&is_main_search

[11]Skelaxin is used to treat discomfort associated with acute painful muscle conditions. Information *available at* www.drugs.com/search.php?searchterm=skelaxin&is_main_search

[12]Naproxen is used for temporary relief of minor aches and pains. These may include arthritis, muscle aches, backache, menstrual cramps, headache, toothache, and those due to a cold. Information *available at* www.drugs.com/search.php?searchterm=naproxen&is_main_search

myofascial pain in the right upper trapezius muscle, C5-6 and C6-7 disc bulges, L5-S1 paracentral herniated nucleus pulposus with osteophytes, L4-5 disc bulge, and cervical, thoracic scapular and lumbopelvic muscle imbalances.  (R. 240, 241, 245, 247, 248, 249).  On May 1, 2001, Dr. Masih assessed a temporary partial disability for her current occupation and a moderate degree for any occupation.  (R. 242, 250).

On August 23, 2001, Carlos E. Rivera, M.D. ("Dr. Rivera"), of Buffalo Spine & Sports Medicine, P.C. performed a followup evaluation and concluded Corson had a temporary partial disability of a moderate degree. (R. 257).  He assessed an L5-S1 disc herniation, chronic pain, probable cervical discogenic pain, and myofascial pain. *Id.*

Gregory J. Bennett, M.D. ("Dr. Bennett"), began treating Corson for low back pain on November 19, 1997. (R. 442-58).  A June 4, 2001 X-ray of Corson's hips showed degenerative disc changes at the lumbosacral junction consisting of loss of disc space and formation of osteophytes. (R. 455).[13]  A lumbar MRI performed on August 23, 2001 showed slight disc degeneration at L4-5 with slight disc bulge and severe degeneration without bulging at L5-S1. (R. 450).  Epidural injections[14] were recommended.  *Id.*  An exam conducted on January 4, 2002 indicated good range of motion of the lumbar spine and negative straight leg raising bilaterally. (R. 267).

---

[13] The record contains a report from Dr. Bennet of a diagnostic test conducted sometime in 2002. (R. 445). The report does not state what type of test was conducted.  Diagnosis is merely coded as "722.10."  *Id.*  The Diagnosis Code handbook states this code signifies displacement of lumbar intervertebral disc without myleopathy. A September 5, 2001 exam by Dr. Bennett diagnosed Corson's condition as 722.52 (degeneration of lumbar or lumbosacral intervertebral disc). (R. 451).  Information *available at* www.icd9data.com/2009/volume1/710-739/720-724/722/722.10.htm.

[14] Epidural injections are used to manage lower back pain. It is usually used in combination with a comprehensive rehabilitation program to provide additional benefit as the effects of the injection tend to be temporary.  Information *available at* www.spine-health.com/treatment/injections/lumbar-epidural-steroid-injections-low-back-pain-and-sciatica.

_____Eugene J. Gosy, M.D. ("Dr. Gosy"), conducted a workers compensation consultation

with Corson on March 21, 2002. (R. 431).  He noted that Corson's cervical range of motion was

reduced on retroflexion by 50%.  (R. 432).  Corson's strength in the extremities was 5/5, reflexes

were 2+ in the upper extremities and brisk in the lower extremities with a few beats of non-

sustained clonus in the ankles, gait was unimpaired, and straight leg raising was intact.  *Id.*

Corson weighed 225 pounds.  *Id.*  Dr. Gosy noted that Corson's functional status is poor and

that Corson's husband does all the housework.  *Id.*  Dr. Gosy's overall impression was that

Corson had intractable mechanical low back pain and medication overuse.  *Id.*

_____On June 18, 2002, Murli Agrawal, M.D. ("Dr. Agrawal"), of Industrial Medicine

Associates  performed an orthopedic evaluation of Corson at the request of the Division of

Disability Determination. (R. 462).  Dr. Agrawal noted that Corson was able to walk on heels

and toes without difficulty, did not appear to be in distress and was able to complete a full squat.

(R. 464).  Additionally, Dr. Agrawal's notes show Corson was able to rise from her chair without

difficulty, she needed no help getting on and off the examining table, nor changing for the exam.

*Id.*  A fine motor activity of hands exam revealed grip strength of 5/5 bilaterally, a normal grip,

and intact hand and finger dexterity.  *Id.*  As to cervical spine, Dr. Agrawal noted flexion of 30°,

extension of 35°, rotation of 60° on each side, lateral flexion 35°, pain in the lower neck and

trapezius muscle, no acute spasm, and nontenderness in the thoracic spine.[15]  *Id.*  Dr. Agrawal

diagnosed Ms. Corson with right knee arthritis, lumbar osteoarthritis with possible left-sided

sciatica, cervical disc disease, and numbness of both hands with no evidence of carpal tunnel. (R.

_____

[15] Normal ranges of motion for the cervical spine are 0 to 45° forward flexion, 0 to 45°extension, 0 to 45° left lateral flexion, 0 to 45° right lateral flexion, 0 to 80° left lateral rotation, 0 to 80° right lateral rotation. Disability Examination Worksheets - Spine Examination *available at* http://www.vba.va.gov/bin/21/Benefits/exams/disexm 53.htm

465).  Dr. Agrawal concluded Corson has mild impairment due to cervical spine disease and

resulting stiffness in the neck, moderate impairment in walking, standing, climbing short

distances and duration due to back and knee pain and disease.  *Id.*

      Corson treated with Ellen Battista, DNS,[16] ANP,[17] PNP[18] and David Bagnall, M.D., of

RehabNY[19] from May 28, 2002 to May 21, 2004. (R. 498-512, 624-40, 643, 655, 665, 670, 693,

705, 722).   In 2002 Dr. Bagnall opined that Corson suffered from degenerative disc disease of

the lumbar spine, L5-S1 disc herniation, chronic left L5-S1 radiculopathy.[20] (R. 512). Dr.

Bagnall concluded Corson had a temporary, partial, moderate disability. *Id.*

      Corson received chiropractic treatment from Julius Horvath, D.C. ("Dr. Horvath"),

between June 4, 2002 and April 21, 2004. (R.  515-43, 589-617).  On April 20, 2004, Dr.

Horvath completed a medical source statement of Corson's ability to do work-related activities.

(R. 601-04).  Dr. Horvath opined that Corson could lift/carry less than ten pounds, stand or walk

for less than two hours per day, must alternate sitting and standing, and was limited in pushing

and pulling with upper and lower extremities.  (R. 603-04).  Corson could occasionally climb

stairs and kneel but could not, according to Dr. Horvath, balance, crouch, crawl or stoop. (R.

603).  Corson was to avoid reaching, but could occasionally handle, finger, and feel. (R. 602).

---

[16]DNS stands for Doctor of Nursing Science. Definition of DNS *available at* http://medical-dictionary.thefreedictionary.com/Doctor+of+Nursing+Science

[17]ANP stands for Adult Nurse Practitioner. Definition of ANP *available at* http://acronyms.thefree dictionary.com/ANP

[18]PNP stands for Pediatric Nurse Practitioner. Definition of PNP *available at* http://acronyms.thefreedictionary.com/PNP

[19]RehabNY specializes in spine, musculoskeletal and pain medicine. (R. 511).

[20]At the time of this exam, the Corson weighed 225 lbs. (R. 511)

On June 2, 2003, Melvin M. Brothman, M.D., ("Cr. Brothman"), conducted an independent medical examination of Corson for the Workers' Compensation Board. (R. 607). He diagnosed degenerative disc disease, pre-existing with some aggravation as a result of the work injury in bilateral radiculopathy. (R. 609). Dr. Brothman concluded Ms. Corson has permanent partial degree of disability and can return to modified work, perhaps sitting and cleaning instruments, that she is unable to bend or lift over 10 pounds and that further treatment, other than pain management, would be of no benefit. *Id.*

Roderick Charles, ("Dr. Charles"), a psychiatrist, began treating Corson in September 1995 for major depression, insomnia, and anorexia with weight loss. (R. 428). At that time, the doctor prescribed Vivactil, an anti-depressant, to Corson. (R. 366).[21]   Dr. Charles continued to treat Corson through the time of the ALJ  hearing.  (R. 366-429, 574-587).

In April 2002, Dr. Charles completed a New York State Office of Temporary and Disability Assistance, Division of Disability Determination questionnaire.  (R. 434-40).  He noted her diagnosis as recurrent major depression and compulsive personality disorder with withdrawal, apathy, depression, sleep disturbance, insomnia, and hypersomnia.[22] (R. 434).  Dr. Charles assessed Corson's attention and concentration as fair, orientation as intact, and insight and judgment as fair to good. (R. 437).  Dr. Charles concluded the following regarding Corson's ability to do work related mental activities: she was limited as to sustained concentration and

---

[21]Ms. Corson's consultation with Dr. Charles was prompted by her problems with an ill mother and step-father, a son with dyslexia and behavioral problems, and post traumatic stress syndrome related to childhood events. (R. 389).

[22]Hypersomnia is a condition marked by excessive daytime sleepiness. Definition of Hypersomnia, *available at* http://webmd.com/sleep-disorders/guide/hypersomnia

9

persistence, (R. 438),[23] limited as to adaption,[24] limited as to social interaction and not limited in understanding and memory.  (R 438-439).  Dr. Charles's conclusion as to Corson's ability to function in a work setting is illegible.  (R. 437).

On July 3, 2004, Dr. Charles completed a medical assessment of Corson's ability to do work related activities. (R. 621).  Dr. Charles stated Corson had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently and maintain attention/concentration.  *Id.*  Corson had a fair ability to understand, remember, and carry out detailed but not complex job instructions. (R. 622).  Corson had a fair ability to behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and a good ability to maintain personal appearance.  *Id.*  Dr. Charles noted that Corson became preoccupied under stress and had not been unable to engage in substantial gainful employment, but probably could not currently work a forty-hour work week.  (R. 621-22).

On June 18, 2002 Robert Hill, Ph.D., ("Dr. Hill"), of Industrial Medicine Associates, P.C., conducted an adult psychiatric examination of Corson.  (R. 468).  Dr. Hill diagnosed Corson with an adjustment disorder with depressed and anxious mood.[25]  (R. 471).  Dr. Hill concluded Corson's psychiatric symptoms limit her vocational capacities only slightly.  *Id.*  Specifically, Dr. Hill found Corson was able to follow and understand simple directions and

---

[23]Sustained Concentration and Persistence was defined on the form as ability to follow simple or detailed instructions, follow schedules, work with others, follow a reasonable pace, sustain ordinary routine without supervision, maintain customary attendance and punctuality, and etc.

[24]Adaption is defined as ability to respond appropriately to change in the work setting, be aware of hazards, trave/use public transportation, set realistic goals, make plans independently, and etc.

[25]Adjustment disorder is a stress-related, short term, nonpsychotic disturbance. Definition of Adjustment Disorder *available at* http://abledev.com/a.htm

instructions, perform simple rote tasks, maintain attention and concentration, consistently perform simple tasks, and learn new tasks. *Id.* Dr. Hill thus concluded Corson should be able to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. *Id.* Dr. Hill did note, however, that Ms. Corson may experience some moderate difficulty due to her reported pain and her limitations and distress due to the physical limitations that she reports and recommended a medical examination to assess these physical limitations. *Id.* Dr. Hill also recommended that Corson should be considered for vocational training and rehabilitation, pending the results of medical exams. *Id.*

Michael Moses, Ph.D., ("Dr. Moses"), reviewed Corson's medical record on July 23, 2002 and assessed non-severe anxiety related and affective disorders. (R. 473). Specifically, Dr. Moses found Corson has an adjustment disorder with depression and anxiety. (R. 476). Dr. Moses concluded Corson had a slight restriction of activities of daily living and maintaining social functioning and seldom had deficiencies in maintaining concentration, persistence or pace, with no episodes of decompensation. (R. 483).

On August 13, 2004, Occupational Therapist Joseph J. Higgins, ("Higgins"), conducted a functional capacity evaluation of Corson at the Work Capacity Center of Western New York. (R. 737-742). Higgins noted Corson sat for 34 minutes during the testing with no problems reported but that Corson began to get up and sit down from that point, stating it bothered her to sit too long. (R. 739). Corson stood for 23 minutes and reported strain in the lumbar region. *Id.* Higgins noted Corson reported pain to right cervical spine when lifting up high or out with right arm. *Id.* However, Corson was able to lift a 10 pound item from the desk to shoulder height on an occasional basis. *Id.* Higgins stated that frequent lifting would be rated at 2 lbs. from table to

shoulder. *Id.* The report concludes that Corson's functional capacity was at the sedentary level. *Id.* Higgins opined that Corson's sitting tolerance was not unreasonable and with getting up and down should be functional in a work that allows that. *Id.* [26]

## DISCUSSION

1. **Disability Determination under the Social Security Act**

An individual is entitled to SSDI benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months... An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).  Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

A. **Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding disability

---

[26] Corson included a 2005 report from physician, Dr. Fitzpatrick, that names a diagnosis of chronic bronchitis and morbid obesity. (R. 743). However, Dr. Fitzpatrick's report was not before the Appeals Council and Corson's counsel has not urged us to consider this new evidence in assessing the ALJ's decision. Additionally, Corson's counsel has not provided us with justification for considering such new evidence. *See generally* 42 U.S.C. § 405(g) (providing that a district court "may at any time order additional evidence to be taken before the Commissioner but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.").

benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion."  *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience."  *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and result from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas*, *supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive."  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and 416.920. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir.

1982).  The first step is to determine whether the applicant is engaged in substantial gainful

activity. 20 C.F.R. §§ 404.1520 (b) and 416.920(b).  If the individual is engaged in such activity

the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step

is to determine whether the applicant has a severe impairment which significantly limits his

physical or mental ability to do basic work activities as defined in the regulations.  20 C.F.R. §§

404.1520 (c) and 416.920 (c).  Absent an impairment, the applicant is not eligible for disability

benefits.  *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in

Appendix 1 of the regulations and meets the duration requirement, the individual is deemed

disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§

404.1520(d) and 416.920(d), as, in such a case, there is a presumption that an applicant with

such an impairment is unable to perform substantial gainful activity.[27]  42 U.S.C. §§ 423

(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*,

1986 WL 12118, at *2 (S.D.N.Y. Oct. 21, 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270

(S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1,

the Commissioner must then consider the applicant's "residual functional capacity" and the

demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the applicant can still

perform work he has done in the past, the applicant will be denied disability benefits.  *Id.*

Finally, if the applicant is unable to perform any past work, the Commissioner will consider the

individual's "residual functional capacity," age, education, and past work experience in order to

determine whether the applicant can perform any alternative employment.  20 C.F.R. §§

---

[27]The applicant must meet the duration requirement which mandates that the impairment must last for at
least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

404.1520(f), 416.920(f).  *See also Berry*, *supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without the "residual functional capacity to perform [his] past work").  If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits.  *Id.*  The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment.  *Berry*, *supra*, at 467.  In reviewing the administrative finding, the court must follow this five-step analysis to determine if there was substantial evidence on which the Commissioner based her decision.  *Richardson*, 402 U.S. at 410 (1971).

### B.     Substantial Gainful Activity

The first inquiry is to determine whether the applicant is engaged in substantial gainful activity.  "Substantial gainful activity" is defined as "work that involves doing significant and productive physical or mental duties and is done for pay or profit."  20 C.F.R. §§ 404.1510 and 419.910.  In this case, the ALJ concluded that Corson had not engaged in substantial gainful activity since the alleged onset date. (R. 25).  This finding is undisputed.

### C.     Severe Physical or Mental Impairment

The next step of the analysis is to determine whether Corson had a severe physical or mental impairment significantly limiting her ability to do "basic work activities."  "Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(c), 416.921(b).  "Basic work activities" include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying

out, remembering simple instructions, use of judgment, responding appropriately to supervision,

co-workers and usual work situations, and dealing with changes in a routine work setting. 20

C.F.R. §§ 404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it

"significantly limit[s]" the applicant's physical and mental ability to do such basic work

activities.  20 C.F.R. §§ 404.1521(a), 416.921 (a)(bracketed text added).

The ALJ concluded the Corson's chronic neck and back discomfort and depression were

considered severe.  (R. 25).  The ALJ then continued on to the next step, a finding of whether

Corson's impairments were severe enough to constitute an impairment as set forth in the Listing

of Impairments, Appendix 1, 20 C.F.R. Pt. 404, Subpt. P, Regulation No. 4, Sections 1.02, 1.04,

and 11.14. *Id.*

### D.    Listing of Impairments, Appendix 1

The third step is to determine whether a claimant's impairment or impairments are listed

in the regulations at Appendix 1 of 20 C.F.R. Pt. 404. Subpt. P.  If the impairments are listed in

the Appendix, they are considered severe enough to prevent an individual from performing any

gainful activity.  20 C.F.R. §§ 404.1525(a), 416.920(a)(4)(iii) and 416.920(d).  In the instant

case, the ALJ determined that the medical evidence indicated that the Corson's chronic neck and

back discomfort and depression were severe within the meaning of the Regulations, but not

severe enough to meet or medically equal one of the impairments listed[28] in Appendix 1, Subpart

P, Regulations No. 4. (R. 25).  The record supports this finding.

The relevant listing impairments in Corson's case are 20 C.F.R. Pt. 404, Subpt. P, App. 1,

---

[28] Although Corson claims that her SSDI claim should have been granted on the basis of a combination of physical and mental ailments. Corson has never asserted that her medical conditions meet one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Plaintiff's Memorandum at 31.

§§ 1.04 ("Disorders of the spine") and §§ 12.04 (Affective Disorders).

To be disabled within the meaning of § 1.04, the medical evidence must demonstrate a herniated nucleus pulposus,[29] spinal arachnoiditis,[30] spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal cord, and accompanied by one of the following:

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness ) accompanied by a sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia[31], resulting in the need for changes in position or posture more than once every 2 hours;
> or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication[32], established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 ("§ 1.04").

Here, the medical evidence establishes that Corson has degenerative disc disease but does

---

[29]A herniated nucleus pulposus is a slipped disk along the spinal cord. The condition occurs when all or part of the soft center of a spinal disk is forced through a weakened part of the disk. Other names for herniated nucleus pulposus is lumbar radiculopathy, cervical radiculopathy. Information *available at* www.nlm.nih.gov/medlineplys/ency/article/000442.htm.

[30]Spinal arachnoiditis is caused by the inflammation of the arachnoid lining in the spinal cord. The inflamation causes constant irritation, scarring, and binding of nerve roots and blood vessels. Information *available at* spineuniverse.com/displayarticle.php/article180.html

[31]Dysesthesia is pain that is not experienced by a normal nervous system. Information *available at* www.painonline.org/dyses.htm

[32]Pseudoclaudication is pain and discomfort in the buttocks, legs and feet due to narrowing of the spinal canal (spinal stenosis). Information *available at* www.valleyhealth.com/health_library/article.asp?ref=HQ01278

not satisfy any of the remaining criteria for a disorder of the spine as defined by § 1.04. (R. 512).

Corson's degenerative disc disease diagnosis is confirmed by a March 18, 2000 MRI showing

decreased signal intensity on T2 and paracentral disc herniation at L5-S1 with secondary

intervertebral foraminal stenosis bilaterally.   *Id.*   An August 23, 2001 MRI also shows decreased

signal intensity on T2-weighted images at L4 through S1 with decreased L5-S1 disc height and

Modic changes.   *Id.*   The latter MRI also indicates continual foraminal stenosis at L5-S1.   *Id.*

Dr. Brothman examined these MRIs and concluded that Corson suffers from degenerative disc

disease.   (R. 608).   However, Corson does not satisfy any of the remaining criteria for a disorder

of the spine as defined by § 1.04.

Specifically, there is no evidence in the record of nerve root compression[33] even though

Corson reported radiating pain from her lower back to her right leg.  (R. 771).  Dr. Mechtler's

neurologic exam revealed that Corson had good strength throughout and symmetric reflexes.  (R.

202). § 1.04(A).  There was no indication of atrophy and cerebellar testing[34] was normal.  *Id.*

Nor is there any evidence in the record that Corson suffers from spinal arachnoiditis, as required

by § 1.04(B).  Finally, Corson was not diagnosed with lumbar spinal stenosis as required under §

1.04(C).  Although Dr. Bennett's notes contain diagnostic tests indicating degeneration of

lumbar discs and Dr. Bagnall diagnosed degenerative disc disease of the lumbar spine, none of

---

[33]Nerve root compression can be the result of disease or injury. Any compromise of the nerve space in the spinal column can lead to compression of the nerve endings. Regardless of the cause, nerve root compression is characterized by pain. The onset of symptoms is characterized by a sharp, burning, stabbing pain radiating down the posterior or lateral aspect of the leg to below the knee. The pain is generally superficial and localized and is often associated with numbness or tingling. In more advanced cases, motor deficit, diminished reflexes, or weakness may occur. Information *available at* www.aafp.org/afp/990201ap/575.html

[34]Cerebellar testing examines gait and balance of the patient. Information *available at* www.vhct.org/case1799/neurologic_exam.htm.

Corson's physicians opined that Corson suffered from lumbar spinal stenosis.  Accordingly, the

ALJ's determination that Corson's back disorder did not meet the criteria for a disorder of the

spine under the Listing of Impairments was based on substantial evidence in the record.

Corson's depression also does not satisfy the listing under § 12.04 for affective disorders.

*See* 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.04(A)(1)(depressive syndrome).  A claimant's

depression meets the Listing criteria for affective disorders when the requirements in both A and

B are satisfied, or when the requirements in C are satisfied. 20 C.F.R., Pt. 404, Subpt. P, App. 1

§ 12.04. Thus, Corson must demonstrate

A.      Medically documented evidence of at least one of the following:

1. Evidence of a depressive syndrome, characterized by at least four of the following:
>        a.  Anhedonia or pervasive loss of interest in almost all activities; or
>        b.  Appetite disturbance with change in weight; or
>        c.  Sleep disturbance; or
>        d.  Psychomotor agitation or retardation; or
>        e.  Decreased energy; or
>        f.  Feelings of guilt or worthlessness; or
>        g.  Difficulty concentrating or thinking; or
>        h.  Thoughts of suicide; or
>        i.  Hallucinations, delusions or paranoid thinking; or
>                        * * *

And

B.      Resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration;

Or

C.      Medically documented history of a chronic affective disorder of at least 2 years' duration
that has caused more than a minimal limitation of ability to do basic work activities, with

symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.04 ("§ 12.04").

Corson cannot show her depression qualifies as a depressive syndrome under the Affective Disorders Listing, § 12.04, as she is unable to satisfy both parts A and B or part C. Although Corson suffers from depression, neither her psychiatrist nor the other psychological consultants have opined that she displays four of the nine enumerated symptoms. Dr. Charles stated in a 2002 questionnaire that Corson's depression is characterized by apathy, withdrawal, and sleep disturbance. (R. 434). Therefore, Corson's depression is characterized by only three symptoms of a depressive disorder under § 12.04(A). Consequently, Corson's depression diagnosis does not satisfy the criteria of that section.

Even if Corson's depression produced the requisite symptoms under § 12.04(A), the record demonstrates that Corson would have been unable to satisfy the requirements of § 12.04(B). Dr. Charles opined that Corson was *limited* in maintaining concentration and persistence and erratic in activities of daily living. (R. 437-438). Dr. Charles did not opine that Corson's depression resulted in marked restrictions in those aspects of functioning, as required by § 12.04(B). *Id.* Dr. Moses, who based his opinion on a review of Dr. Charles's treatment notes, opined that Corson had only slight restrictions of activities of daily living and maintaining social functioning, seldom had deficiencies in maintaining concentration, persistence or pace and

never had episodes of decompensation.  (R. 483).  Dr. Hill's evaluation of Corson, done within a vocational capacities context, indicates that Corson is able to maintain concentration, relate adequately with others and appropriately deal with stress.  (R. 471).  In fact, Dr. Hill's conclusion emphasized the effect of Corson's exertional impairments on her functioning rather than any nonexertional impairments, such as depression.  *Id.*  Therefore, the record demonstrates that Corson would have been unable to satisfy § 12.04(A) and (B), as required to prove a Listed Impairment.

As discussed, discussion *supra*, at 19, Corson could have also demonstrated her depressive syndrome met the severity of a Listed Impairment by satisfying § 12.04(C). However, although Corson has been diagnosed with depression since 1995, the record does not indicate this has led to more than a minimal limitation of ability to do basic work activities.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.04(C).  Rather, as Dr. Charles, Dr. Hill and Dr. Moses concluded, Corson's depression had  only a limited or slight limitation on her activities of daily living, social functioning, and concentration.  (R. 437-38, 471, 483).  Under § 12.04(C), Corson would have also had to demonstrate one of the three enumerated criteria in order to satisfy the severity level of a depressive disorder under the Listing and there is no evidence in the record that offers support for such a finding.

Specifically, the record does not indicate that Corson's depression led to periods of decompensation as required by § 12.04(C)(1).  Dr. Moses concluded that Corson has never had periods of decompensation.  (R. 483).  Similarly, the record is devoid of evidence that Corson has a residual disease that would be exacerbated with a minimal increase in mental demands or change in the environment, as required by § 12.04(C)(2).  Dr. Charles opined in 2004 that

21

Corson had a fair ability to behave in an emotionally stable manner, relate predictably in social situations, and function independently. (R. 621- 622).  In Dr. Hill's opinion, Corson was able to deal appropriately with stress and make appropriate decisions.  (R. 471).  Overall, these psychological assessments do not describe an individual likely to decompose upon an increase in mental demands or change in the environment.  Accordingly, the record does not support a finding of § 12.04(C)(2) conditions for disability on this basis.  Finally, Corson cannot satisfy § 12.04(C)(3) as she has not indicated a history of 1 or more years' inability to function outside of a highly supportive living arrangement.  Based on the foregoing, the ALJ's conclusion that Corson's depression did not meet the severity level of § 12.04 was supported by substantial evidence.

Therefore, the ALJ's conclusion that Corson's depression and chronic back and neck discomfort, although severe, do not meet or equal any of the listed impairments was supported by substantial evidence.  The ALJ next considered whether Corson retained the residual functional capacity to perform the requisites of her past or relevant work. (R. 22-25).

### E.    "Residual Functional Capacity" to Perform Past Work

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work.  "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity. *Cosme v. Bowen*, 1986 WL 12118, at *3 (S.D.N.Y. Oct. 21, 1986).  Here, the ALJ found Corson was unable to perform her past relevant work experience as a nurse's aide. (R. 26). This finding is undisputed.

22

**F.      Suitable Alternative Employment in the National Economy**

As the ALJ concluded that Corson was unable to perform her past relevant work, the ALJ examined whether there was any position within the national economy for which Corson would be qualified or suitable. (R. 24-25).  Because of the ALJ's finding that Corson's impairments prevented her from returning to her previous work, the burden shifted to the Commissioner to prove that there was substantial gainful work that Corson could perform in light of her physical capabilities, age, education, experience, and training. *Parker*, 626 F.2d at 231.  Further, it is the rule in the Second Circuit that "all complaints . . . must be considered together in determining . . . work capacity."  *DeLeaon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).  It is improper to determine a claimant's work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *Gold v. Sec'y of Health and Human Servs.*, 463 F.2d 38, 42 (2d Cir. 1972).

To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other employment opportunities.  *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Decker*, *supra*, at 294. An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[35]  *Id.*

---

[35] "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

In this case, the ALJ determined that Corson could not return to her past work as a nurse's aide.  However, the ALJ held that Corson retained the following residual functional capacity: sit for two hours at a time and with normal breaks and meal periods up to eight hours in an eight hour workday; stand or walk on an occasional basis and up to two hours in an eight hour workday, lift and carry up to 10 pounds on an occasional basis. (R. 24).  The ALJ concluded that Corson retained the residual functional capacity to perform a full range of unskilled sedentary work.  *Id.*  Accordingly, the ALJ considered Corson's age, education and unskilled work experience in applying the grids and ultimately determining that Corson was not disabled. *Id.*

Corson, however, asserts the ALJ erred in not affording the requisite weight to the opinion of Corson's treating physicians.  (Pl.'s Memorandum at 25).  Specifically, Corson argues that the ALJ incorrectly rejected the medical opinions of Dr. Regalla, Corson's primary physician, Dr. Higgins, a physical therapist, Dr. Charles, Corson's psychiatrist, and Dr. Horvath, a chiropractor regarding Corson's disability status.  *Id.* at 26-27.  Additionally, Corson argues that the ALJ failed to provide an "acceptable reason" for rejecting the medical opinions of these physicians.  The ALJ's decision does not support Corson's contentions.

Generally, the Commissioner grants the opinion of a treating physician controlling weight only if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. 20 C.F.R. § 404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).  The Commissioner's regulations specify the following

factors as relevant "in determining the weight to give the [treating physician's] opinion": (1) the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence in support of the opinion, for example, the more evidence presented to support a medical opinion, particularly laboratory findings and other medical signs, the more weight the opinion is entitled to, (3) the opinion's consistency with the record as a whole, (4) whether a specialist formed the opinion, as specialists are entitled to more weight, and (5) other factors which are unspecified, but may contribute to the amount of weight to which a medical opinion is entitled. 20 C.F.R. § 404.1527(d); *Schisler*, *supra*, at 567.

Here, the ALJ considered the treatment notes of Dr. Regalla, an internist, but accorded greater weight to the treating specialists' opinions. However, the opinion of a treating physician is not afforded controlling weight where the treating physician's opinions contradict other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Commissioner of Social Security*, 236 Fed. Appx. 641, 643-44 (2d Cir. 2007). Although Dr. Regalla treated the Plaintiff since at least May 2000, the medical record reveals significant referrals to specialists for Corson's back and neck ailments. Specifically, Corson treated with Dr. Bennett, Dr. Masih, Dr. Rivera, Dr. Mechtler and Dr. Bagnall for back and neck problems in the relevant time period. (R. 196-640). Additionally, Corson received chiropractic treatments from Dr. Horvath, pain management from nurse Battista at RehabNY, epidural injections from Dr. Bennett, and physical therapy from South Shore Physical Therapy Associates of Western New York. *Id.* Collectively, these physicians regulated Corson's pain medication and prescribed and evaluated diagnostic exams. *Id.* Therefore, it was appropriate for the ALJ to accord greater weight to the opinions of the medical experts regarding Corson's back and neck

pain.

Additionally, it was proper for the ALJ to accord greater weight to the opinions of the medical specialists when their opinions conflicted with those of Dr. Regalla. *See* 20 C.F.R. § 404.1527(d)(5). Dr. Regalla opined that Corson was temporarily totally disabled (R. 278-318) while the medical specialists assessed Corson was temporarily partially disabled. Dr. Masih and Dr. Bagnall, Corson's treating medical specialist physicians, evaluated Corson as having a temporary partial disability. (R. 242, 512). Dr. Fricke, an independent medical examiner, also diagnosed temporary partial disability. (R. 238). Dr. Agrawal determined Corson had a mild impairment in walking, standing and climbing during an orthopedic evaluation of Corson's disability claim for the Division of Disability. (R. 462). As Dr. Regalla's assessment regarding Corson's disability status contradicts the opinions of medical specialists , the ALJ correctly accorded greater weight to the latter's opinions. (R. 22).

Corson also argues that the ALJ did not accord the requisite weight to the medical opinions of Dr. Higgins, a physical therapist, and Dr. Horvath, Corson's chiropractor. Plaintiff's Memorandum at 26. According to the regulations, however, chiropractors' and physical therapists' opinions are not  medical opinions. *See Diaz v. Shalala*, 59 F.3d 507, 513 (2d Cir. 1995); *Hussain v. Astrue*, 2008 WL 4724301, *6 (W.D.N.Y. Oct. 24, 2008). The regulations provide that "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of . . . impairment(s) . . ..", *Diaz,* 59 F.3d at 513, (citing 20 C.F.R. § 404.1527(a)(2)). Section 404.1513(a) lists five categories of "acceptable medical sources," none of which mentions chiropractors or physical therapists. Instead, chiropractors and physical therapists are expressly

26

listed in a different section, under "other sources" whose "[i]nformation . . . may . . . help us to understand how [the] impairment affects your ability to work." *Id.* (citing 20 C.F.R. § 404.1513(e) (1994)).  Because the regulations do not classify chiropractors or physical therapists as either physicians or "other acceptable medical sources," neither Dr. Horvath nor Dr. Higgins can provide medical opinions that require recognition and weight by the Commissioner equal to a medical doctor.  As such, the ALJ was correct in not according their opinions the same weight as the medical doctors.

Corson also argues that the ALJ improperly rejected the medical opinion of Dr. Charles, Corson's treating psychiatrist.  Plaintiff's Memorandum at 25-26.  However, the ALJ noted Dr. Charles's extensive treatment of Corson's depression and his opinion that Corson's mental disorder resulted in only mild limitations.  (R. 23).  Additionally, while Corson argues that Dr. Charles opined that Corson has been unable to engage in substantial gainful employment, the record indicates the opposite.  Plaintiff's Memorandum at 26.  Dr. Charles actually determined that Corson has not been unable to engage in substantial gainful employment.  (R. 622).  Further, Dr. Charles qualified his opinion by stating that Corson probably cannot currently engage in substantial gainful employment on a 40-hour work week.  *Id.*  Therefore, Dr. Charles's assessment does not favor a finding of disability.  The ALJ correctly evaluated Dr. Charles's opinions and accorded them appropriate weight.

Corson also argues that the ALJ erred in finding her testimony not credible.  Plaintiff's Memorandum at 25.  Specifically, the ALJ found that Corson's assertions regarding her limitations were not supported by the record as a whole.  (R. 22).  The record before the ALJ established that Corson's allegations of limitations are not fully credible and the ALJ did not err

27

in so finding.

Subjective symptomatology, by itself, cannot be the basis for finding a disability. *Stebbins v. Astrue*, 2008 WL 4855558, *16 (W.D.N.Y., June 19, 2008) (citing 42 U.S.C. § 423 (d)(1)(A)). While subjective complaints alone are not sufficient to support a finding of disability, such complaints must be accorded weight when they are accompanied by "evidence of an underlying medical condition" and an "objectively determined medical condition [which is] of a severity which can reasonably be expected to give rise to the alleged pain." *Cameron v. Bowen*, 683 F. Supp. 73, 77 n. 4 (S.D.N.Y. 1984). The act requires medical signs or other findings which show there is a medical condition that reasonably could be expected to produce the conditions alleged and that, considered with all the evidence, demonstrates that a claimant is disabled. 20 C.F.R. § 416.929, Social Security Ruling 96-7P ("SSR 96-7P"). As such, the ALJ is not required to "accept without question the credibility of such subjective evidence." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Rather, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.* at 27; *see also* SSR 96-7P, 1996 WL 374186, at *1 (July 2, 1996) ("When the existence of a medically determinable physical...impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated . . . This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.").

Corson has consistently claimed significant back and neck pain render her disabled. The medical record as a whole demonstrates degenerative changes in the back, knee, and cervical

area that support Corson's claims of pain.  The ALJ's findings acknowledge that Corson's chronic neck and back pain is severe.  (R. 25).  However, the record also supports the ALJ's findings that these ailments are not as debilitating as Corson claims.  Consequently, the ALJ's credibility finding was supported by substantial evidence in the record.

For example, Corson testified she was able to shower and dress herself, drive ten miles away from her home, and prepare some meals for herself.  (R. 780-81).  During her 2001 examination with Dr.  Fricke, Corson admitted to cooking all the meals with help in "hand mixing" and her own independence in activities of daily living.  (R. 237).  Similarly, during an orthopedic evaluation by Dr. Agrawal in 2002, Corson reported being able to walk for fifteen minutes per day, travel by car, lift up to ten pounds, sit for ten to fifteen minutes, shower and dress by herself, and cook once a week.  (R. 463).  During a 2002 consultation with Dr. Bagnall, Corson stated her pain is better with sitting and worse with standing and walking (R. 511).  However, Corson testified at her ALJ hearing that her pain is exacerbated with sitting, standing and walking.  (R. 771).  Corson also reported that she is independent in activities of daily living, that she is able to drive, and does not need assistive devices.  *Id.* at 512.  The foregoing testimony contradicts Corson's claims of total disability and thus renders her testimony less than completely credible.

The medical record also supports the ALJ's finding that Corson's testimony regarding her vocational status is incredible.  For example, Dr. Fricke concluded that although Corson suffered from degenerative disc disease that rendered her temporarily partially disabled, Corson would be able to return to work on a restricted capacity with no lifting of more than 10 pounds and restricted bending and twisting.  (R. 238).  Likewise, Dr. Masih's 2001 examinations of

Corson noted restrictions of the lumbar range of motion and Corson's pain in the disc but nevertheless classified her status as a temporary partial disability of a moderate degree and recommended modified duty restrictions.  (R. 240-50, 261, 57-64).  In a 2002 report, Dr. Brothman while acknowledging that Corson has degenerative disc disease and has reached maximum medical improvement, stated that Corson would be able to return to modified work. (R. 609).  Dr. Brothman suggested a position involving sitting and cleaning instruments.  *Id.*  Dr. Bennett, who has treated Corson since 1997 for back pain and oversaw her epidural injections, noted in 2002 that Corson's lumbar spine showed good range of motion, there was no palpable tenderness along Corson's paraspinal muscles of the lumbar spine, and a motor exam to her lower extremities was intact.  (R. 444).  Similarly, in 2002 Dr. Agrawal noted that Corson was able to walk on heels and toes without difficulty, perform a full squat, climb and get off the examining table independently, change for the exam without assistance, and perform the exam without assistive devices.  (R. 464).  Dr. Agrawal diagnosed a moderate impairment in walking, standing and climbing short distances due to the back and knee pain, no impairment in fine or gross motor activities of the upper extremities, and a slight degenerative arthritis in the right knee. (R. 465).  Collectively, these physicians' notes, while acknowledging Corson's chronic neck and back pain, do not indicate that Corson has become totally disabled as a result. Instead, the opinions suggest a sedentary work capacity, as the ALJ concluded.  Therefore, the ALJ correctly concluded that Corson's testimony regarding her vocational capacity in light of the neck and back pain was not credible.

Corson also argues that the ALJ failed to consider Corson's work record in evaluating her credibility.  Plaintiff's Memorandum at 30.  *See generally Janas v. Barnhart*, 451 F. Supp.2d

483, 501 (W.D.N.Y. 2006) (holding that a good work history may be deemed probative of

credibility); *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good

work record is entitled to substantial credibility when claiming an inability to work because of a

disability.").  Although the ALJ explicitly noted Corson's work record and her steady modest

earnings in the decision, (R. 22), the ALJ nevertheless determined that the favorable presumption

of credibility created by Corson's work record was rebutted based on (i) the fact that Corson

received only a partial rate of worker's compensation, (ii) Corson certified that she was ready,

willing, and able to work each time she cashed her unemployment insurance but actually looked

for work she could not perform, and (iii) the Functional Capacity Evaluation which indicated

that Corson showed guarded self restrained effort during the exam.  (R. 22-23).  Therefore, the

ALJ accorded  proper weight to Corson's work record in rendering his credibility finding against

Corson.

  Upon determining that Corson retained the residual functional capacity to meet the

demands of sedentary work, the ALJ, in accordance with the second prong of the analysis,

applied the grids to determine whether particular jobs existed in the national economy practical

for an individual limited to Corson's abilities and skills, *Decker*, *supra*, at 296, and concluded

that Corson was not disabled.  (R. 24).  Specifically, the grids are often used to determine

whether alternative employment exists in the national economy.  *Decker*, *supra*, at 296; *Bapp v.

Bowen*, *supra*, at 604.  The grids combine several factors including education, work experience,

and age to determine whether a finding of "disabled" should be rendered.  In this case, the grids

show Corson, who, as of August 18, 2004, the date of the administrative hearing, was 44 years of

age, is a younger individual, between the ages of 18 and 44, with an eleventh grade education

and no transferable skills from any past relevant work, and who was capable of sedentary work, would not be found disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.21 and 201.27.

Corson argues that the ALJ erred in relying on the grids as she exhibits nonexertional[36] limitations which restrict her from performing a full range of work.  Plaintiff's Memorandum at 34.  The Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the grids is improper; rather, the claimant must be evaluated on an individual basis, and that such evaluation on an individual basis can "can be met only by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (reversing district court's decision upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an individual basis, including testimony by a vocational expert, given that the grids do not apply to claimants who are unable to perform a full range of sedentary work); *see also Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986) (holding that application of the grids is inappropriate if a claimant suffers from nonexertional impairments which diminish his or her ability to perform a full range of work).  However, the testimony of a vocational expert is not required where there is a finding that the claimant can perform a full range of work within a given category.  *Thompson v. Barnhart*, 75 Fed. Appx. 842, 844 (2d Cir. 2003).

Here, the record supports the ALJ's conclusion that Corson can perform a full range of sedentary work.  The psychological assessments collectively indicated only mild limitations on

---

[36]Nonexertional limitations are symptoms, like pain, that affect the ability to meet the demands of jobs other than the strength demands. Examples of nonexertional limitations include difficulty concentrating, anxiety, depression, and problems remembering detailed instructions. 20 C.F.R. § 404.1569a.

Corson's social functioning, concentration, persistence and pace on complex and varied tasks, with no limitations on simple, repetitive and routine tasks, no episodes of decompensation, and no limits on activities of daily living.  (R. 366- 429, 434-40, 468-71, 473-483, 574-587, 621-22). The physical examinations revealed that Corson could lift up to 10 pounds (R. 238, 609), had only moderate impairment in walking, standing and climbing, (R. 464-65), with intact reflexes and good strength throughout the examination (R. 202).  A functional capacity evaluation established Corson's functional capacity was at the sedentary level. (R. 739).  Therefore, the ALJ's decision that Corson could perform a full range of sedentary work is substantially supported by the record. As such, the ALJ's application of the grids was correct and the ALJ was not required to call a vocational expert to testify.

Lastly, Corson argues that the ALJ failed to consider a combination of her exertional[37] and nonexertional impairments in concluding that she was not disabled.  Plaintiff's Memorandum at 31.  Specifically, Corson claims the ALJ erred in evaluating the combined effects of Corson's depression, inability to concentrate, pain, and neck and back problems. *Id* at 32. In evaluating whether a claimant is disabled, the ALJ is required to address multiple impairments in combination and to consider their cumulative effect as well as the combined effects of nonsevere impairments.  *Walterich v. Astrue*, 578 F.Supp.2d 482, 503 (W.D.N.Y. 2008) (citing 20 C.F.R. § 404.1523).  However, an ALJ's failure to make a finding on this question does not mandate the conclusion that the ALJ failed to consider the entirety of the claimant's impairments.  *See, e.g., Mendez v. Barnhart*, 2007 WL 186800, * 12 (S.D.N.Y. Jan. 23, 2007) (finding the ALJ's decision indicated that all of claimant's ailments were considered

---

[37]Exertional impairments exist where a claimant's ability to sit, stand, lift, walk, carry, push or pull are limited. 20 C.F.R. § 404.1569a

despite the absence of specific findings on a particular impairment in the ALJ decision).  The record in this case indicates that the ALJ considered all of Corson's impairments in reaching a determination as to Corson's disability.

For example, the ALJ questioned Corson extensively during the ALJ hearing in regard to the medications, pain management treatments, and assistive devices Corson used to control her pain.  (R. 766-86).  The ALJ also evaluated Corson's medical record which contained information regarding Corson's physical therapy, chiropractic treatments, pain medication prescriptions, pharmacy invoices, and Corson's reports of pain to physicians.  (R. 24-25).  Additionally, the ALJ noted medical opinions which were issued based on Corson's subjective complaints of pain and physicians' evaluations.  *Id.*  Finally, the ALJ considered Corson's testimony during the ALJ hearing and her statements to various physicians in assessing the effect of Corson's pain on her functional capacity. (R. 24- 25, 766-86).  Under Second Circuit precedent, the ALJ was permitted to "exercise discretion to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *Taylor v. Barnhart*, 83 Fed. Appx. 347, 350 (2d Cir. 2003).  Therefore, the record does not support Corson's contention that the ALJ failed to consider the effect of Corson's pain in assessing her disability.

Neither does the record support Corson's argument that the ALJ failed to consider the effect of her depression and concentration problems in evaluating her disability status.  Specifically, ALJ examined Corson's psychological evaluations, which assessed the effect of nonexertional factors, such as depression and inability to concentrate, on Corson's vocational abilities.  (R. 24-25).  None of Corson's psychological evaluations indicated Corson was totally

disabled from work as a result of nonexertional impairments. Notably, none of the physicians' reports indicated Corson suffered from a complete inability to engage in substantial gainful activity based on a combination of exertional and nonexertional impairments. Rather, these opinions collectively indicated Corson retained, despite her varied difficulties, a sedentary work capacity. (R. 24). Corson fails to cite any authority where a claimant was found disabled within the meaning of the Act on the basis of these impairments, and the court's own research has revealed none. Therefore, Corson's argument that in evaluating her claims, the ALJ failed to consider the combined effect of Corson's exertional and nonexertional impairments is without merit. To the contrary, the record established that the ALJ evaluated all of Corson's impairments and subjective complaints but determined, properly, that these ailments did not sufficiently impair Corson's range of occupational capacity to establish her entitlement to benefits under the Act. Consequently, the ALJ's decision on this issue is substantially supported by the evidence in the record.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion should be GRANTED; Plaintiff's motion should be DENIED, and the Clerk of the Court should be directed to close the case.

Respectfully submitted,

/s/ *Leslie G. Foschio*

Leslie G. Foschio
United States Magistrate Judge

Dated: February 11, 2009
      Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: February 11, 2009
        Buffalo, New York